UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

        -against-

R. LINDLEY DE VECCHIO,

               Defendant.

-----------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 06-CR-235 (FB)

*Appearances:*
*For the State of New York:*
CHARLES J. HYNES, ESQ.
District Attorney, Kings County
By: ANN BORDLEY, ESQ.
Assistant District Attorney
350 Jay Street
Brooklyn, NY 11201

*For the Defendant:*
DOUGLAS E. GROVER, ESQ.
GINNINE FRIED, ESQ.
MARK A. BEDEROW, ESQ.
Thompson Hine LLP
335 Madison Avenue, 12th Floor
New York, NY 10017

**BLOCK, Senior District Judge:**

On March 23, 2006, a grand jury of the New York Supreme Court, Kings County, indicted defendant, R. Lindley DeVecchio ("DeVecchio"), on four counts of second-degree intentional murder. Following arraignment, DeVecchio filed a notice of removal pursuant to 28 U.S.C. § 1446(a) seeking to remove the case to this Court under 28 U.S.C. §1442(a)(1), which authorizes the removal of a state case in which a federal officer is criminally prosecuted "for any act under color of [his or her] office"; the People of the State of New York ("the State") oppose removal.[1]

---

[1] 28 U.S.C. § 1446(a) requires a defendant seeking removal of a civil or criminal case to file with the appropriate district court "a notice of removal . . . containing a short and plain statement of the grounds for removal." In criminal cases, the notice must be filed within thirty days after arraignment, *id.* § 1446(c)(1), and must "include all grounds for [the] removal," *id.* § 1446(c)(2); the district court must then consider the propriety of removal *sua sponte. See id.* §§ 1446(c)(4) (providing for summary remand "[i]f it clearly appears on the face of the notice and any exhibits annexed thereto that removal should not be permitted") & (c)(5) (setting forth procedures for cases not summarily remanded).

Having considered the parties' submissions and having heard oral argument on August 9, 2006, the Court concludes that removal is not warranted because it lacks subject-matter jurisdiction.

## I.

### A. Background

The following background facts, taken from the parties' submissions, are undisputed:

DeVecchio worked for the Federal Bureau of Investigation ("FBI") between 1965 and 1996, when he retired with full benefits. For a significant portion of that time period, he was a supervisory special agent ("SSA") in charge of organized-crime investigations in and around New York City.

As part of his duties, DeVecchio "handled" – that is, developed and maintained relationships with – several confidential informants ("CIs") who provided inside information about the criminal activities of New York's "five families." One of DeVecchio's CIs was Gregory Scarpa, Sr. ("Scarpa"), a "made" member of the Columbo family. Scarpa was initially recruited as a CI for the FBI in the 1960s and 1970s, during which time he provided information concerning organized-crime activities; by 1978, he had become a dormant source.

On July 1, 1980, Scarpa was re-approved as a CI and assigned to DeVecchio for handling. Over the next twelve years, DeVecchio had innumerable private conversations with Scarpa. DeVecchio was authorized to meet with Scarpa without other agents present and to pay Scarpa for the information he provided.

DeVecchio remained Scarpa's handler until September 4, 1992, when Scarpa was terminated as a CI due to his implication in a murder unrelated to the present prosecution. Scarpa's involvement in the murder triggered an (ultimately inconclusive) internal FBI investigation into his

relationship with DeVecchio. Scarpa died in prison in 1994.

## B. The Indictment

The indictment alleges that on four occasions DeVecchio committed second-degree intentional murder in violation of New York Penal Law § 125.25(1) by aiding and abetting Scarpa in the murders of four individuals. *See* N.Y. Penal L. § 20.00 ("When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct.").

In addition to the indictment, the State has submitted the affidavit of Assistant District Attorney Ann Bordley ("Bordley"), which elaborates on the basis for the prosecution as follows:

### 1. Murder of Mary Bari

On September 24, 1984, Mary Bari ("Bari") was shot and killed at a bar in Brooklyn. Bari was the girlfriend of Alphonse Persico, a fugitive from justice and the brother of Carmine Persico, the *capo* of the Colombo family. The State alleges that Scarpa and some of his associates shot and killed Bari; DeVecchio's alleged role is described as follows:

> A few days before September 25, 1984, . . . defendant informed Scarpa that Bari was speaking to federal law enforcement agents. Defendant expressed concern that Bari would tell the agents where Alphonse Persico could be found. Defendant told Scarpa that he had to take care of this problem. Scarpa told defendant not to worry and said that he (Scarpa) would take care of the matter.

Bordley Aff. ¶ 12.

### 2. Murder of Joseph DeDomenico, Jr.

On September 17, 1987, Joseph DeDomenico, Jr. ("DeDomenico"), was shot and killed in a car in Brooklyn; DeDomenico was a member of Scarpa's "crew" and had committed a number of bank robberies with Scarpa. The State alleges that Scarpa's son, Gregory Scarpa, Jr., and

3

others shot and killed DeDomenico; DeVecchio's alleged role is described as follows:

> In the early spring of 1986, defendant met with Scarpa [and told him] about the burglaries that DeDomenico had been committing behind Scarpa's back. Defendant also told Scarpa that DeDomenico had left his wife and was now with a woman who was a born-again Christian. Defendant said that he did not trust DeDomenico and that he was worried that DeDomenico might talk. Defendant told Scarpa that they could not keep DeDomenico around and that Scarpa had to do something about him. Scarpa said that he would take care of it.

*Id.* ¶ 19.

### 3. *Murder of Patrick Porco*

On May 26 or 27, 1990, Patrick Porco ("Porco"), was shot and killed in a car in Brooklyn; in late 1989, Porco had, with Scarpa's son Joey and others, shot and killed one Dominic Masseria. The State alleges that Joey Scarpa and a friend shot and killed Porco; DeVecchio's alleged role is described as follows:

> In May of 1990, [Scarpa had a five- to ten-minute telephone conversation with DeVecchio. Immediately following the conversation,] Scarpa told Schiro [Linda Schiro, Scarpa's common-law wife], "I can't believe this fucking kid. Patrick is going to rat on Joey. We got to do something about this" . . . .
>
> [Upon returning home,] Scarpa called his son Joey into the dining room. He told Joey that Porco was going to inform the authorities of Joey's role in the murder of Masseria.

*Id.* ¶¶ 28-29.

### 4. *Murder of Lorenzo Lampasi*

In 1991, a protracted war broke out between rival factions within the Colombo family. One faction, which included Scarpa, was loyal to Carmine Persico, who was then in prison; the other faction was loyal to the family's acting boss, Victor A. Orena.

On May 22, 1992, Lorenzo Lampasi ("Lampasi"), was shot and killed outside his home in Brooklyn; Lampasi was a member of Orena's faction. The State alleges that Scarpa and two

associates shot and killed Lampasi; DeVecchio's role is described as follows:

> On or about May 15, 1992, . . . Scarpa told defendant that he wanted
> to kill Lorenzo Lampasi, who was part of the Orena faction. Scarpa
> asked defendant for information on Lampasi, including the address
> where Lampasi was living and the time that Lampasi left his house
> for work in the morning. . . .
>
> On or about May 19 or May 20, 1992, . . . [d]efendant gave Scarpa
> Lampasi's address and said that Lampasi left his home for work at 4
> a.m. Defendant also told Scarpa about the gate on Lampasi's
> driveway. Defendant told Scarpa that Lampasi had to get out of his
> car to open and close the gate.

*Id.* ¶¶ 34, 36.

## C. The Notice of Removal

In his notice of removal, DeVecchio alleges that "[a]t all times relevant to this proceeding, [he] was acting under the express authority conferred on him by virtue of his position as a Supervisory Special Agent of the FBI investigative organized crime squads," and that "[h]is relationship with [Scarpa] was also a part of his duties as a Supervisory Special Agent of the FBI." Not. of Removal ¶ 7. He alleges that "[t]he criminal acts alleged in the indictment specifically relate to and depend on alleged statements and actions between SSA DeVecchio and [Scarpa]." *Id.* ¶ 3.

DeVecchio further alleges that he "intends to assert federal defenses." *Id.* ¶ 8. His proffered defenses are (1) "a defense of immunity on the Constitution's Supremacy Clause," *id.*; and (2) that "the evidentiary basis for this prosecution, in whole or in part, is based on testimony given by SSA DeVecchio which was compelled pursuant to federal grants of immunity, or evidence derived therefrom, in violation of SSA DeVecchio's privilege against self-incrimination under the Constitution of the United States." *Id.* ¶ 9. He alleges that these defenses "will involve the examination of past and current federal officials, . . . as well as the introduction of documents exclusively in the possession of the United States Government." *Id.* ¶ 10.

To support the allegations in his notice of removal, DeVecchio has submitted the affidavit of his attorney, Douglas Grover ("Grover"), which recounts DeVecchio's relationship with Scarpa. Grover's affidavit also includes, as an exhibit, DeVecchio's CI file on DeVecchio; the file, which covers the period from June 26, 1980, to November 17, 1992, consists of memoranda summarizing the information provided by Scarpa to DeVecchio (i.e., "[Scarpa] advised [DeVecchio] that . . . "). The memoranda do not include summaries of what, if anything, DeVecchio told Scarpa; nor do they make mention of the Bari, Porco and Lampasi murders. The DeDomenico murder is mentioned once, but the reference in no way implicates DeVecchio in the murder. Grover Aff., Ex. C, at 00000988.[2]

DeVecchio has also submitted a statement he gave to the FBI in the course of its internal investigation; although the statement was compelled, the FBI promised that it "cannot be used in a criminal prosecution against [DeVecchio]." Grover Aff., Ex. N. In the statement, DeVecchio confirmed that, over the course of their relationship, he "established an excellent rapport" with Scarpa, and that Scarpa made "significant contributions to the FBI's efforts in fighting Organized Crime." *Id.* The statement then details DeVecchio's recollection of his conversations with Scarpa about specific topics, but does not reference any of the four murders charged in the indictment.

DeVecchio's relationship with Scarpa also required him to give compelled trial testimony in this court, again in exchange for immunity: *United States v. Victor Orena*, Case No. 92-CR-351 (Weinstein, J.), and *United States v. Gregory Scarpa, Jr.*, Case No. 94-CR-1119 (Raggi, J.). DeVecchio's trial testimony centers on his knowledge, or lack thereof, of Scarpa's involvement in

---

[2]Scarpa's CI file was submitted under seal; accordingly, the Court will not elaborate on the specific conversations memorialized in the file.

various crimes of violence; as with his statement to the FBI, DeVecchio's trial testimony contains no mention of any of the murders at issue here.

Even though neither the compelled FBI statement nor the compelled trial testimony addresses any of the four murders, DeVecchio nonetheless claims that both "have been improperly used, either directly or indirectly, to procure the present prosecution[.]" Def.'s Mem. of Law at 18.

Finally, following oral argument, DeVecchio submitted his own affidavit, in which he described the general nature of the relationship between a special agent and a confidential source:

> The special agent's relationship with a confidential source is a special one. He is always aware of the potential danger to his source as well as to himself, and he is always concerned about maintaining the trust of his source. Any special agent who handles a confidential source did so (and still does so) in a highly sensitive and clandestine way. The FBI encourages these clandestine relationships because the information derived from these sources is the lifeblood of its investigatory activity.

DeVecchio Aff. ¶ 3. With regard to his specific relationship with Scarpa, DeVecchio avers as follows:

> Every conversation I had with Scarpa was in furtherance of my duties and responsibilities as a special agent of the FBI. At no time did I ever instruct Scarpa to murder anyone; nor did I ever conspire with him to plan any murder. I have never knowingly provided Scarpa with information which could have led to, or assisted him, in the murder of any individual."

*Id.* ¶ 9.

## II.

Congress has authorized federal-officer removal, in one form or another, since 1815. *See Willingham v. Morgan*, 395 U.S. 402, 405 (1969) (tracing history of federal-officer removal statutes). Such removal is currently authorized by 28 U.S.C. § 1442, which, as pertinent here, provides that

> [a] civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

*Id.* § 1442(a)(1). DeVecchio's invocation of the Court's jurisdiction relies solely on this statute.[3]

"Federal officers and employees are not, merely because they are such, granted immunity from prosecution in state courts for crimes against state law." *Colorado v. Symes*, 286 U.S. 510, 518 (1932). Rather, the long-recognized purpose of federal-officer removal is the protection of federal *authority*:

> [The federal government] can act only through its officers and agents, and they must act within the States. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a State court, for an alleged offence against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their

---

[3] A threshold issue is whether an evidentiary hearing is required under § 1446(c)(5), which provides that, "[i]f the United States district court does not order the summary remand of [a removed] prosecution, it shall order an evidentiary hearing to be held promptly and after such hearing shall make such disposition of the prosecution as justice shall require." Despite the mandatory language of the statute, it is "well settled that parties may stipulate to a waiver of the evidentiary hearing." *Wyoming v. Livingston*, 443 F.3d 1211, 1225 n.8 (10th Cir. 2006); *see also New York v. Tanella*, 239 F. Supp. 2d 291, 295 (E.D.N.Y. 2004) ("Here, both the State and defendant agree that no evidentiary hearing is required because there is no disagreement about the facts relevant to the court's determination of the removal issue.").

The only serious factual disputes between the parties are (1) whether DeVecchio committed the charged acts, and (2) whether the prosecution is based on DeVecchio's allegedly immunized statements. These disputes, however, go to the merits of the case; it is unnecessary and inappropriate to resolve them at an evidentiary hearing under § 1446(c)(5). *See Willingham*, 395 U.S. at 407 ("[T]he officer need not win his case before he can have it removed."). Unsurprisingly, therefore, neither party requested an evidentiary hearing.

> protection, – if their protection must be left to the action of the State
> court, – the operations of the general government may at any time be
> arrested at the will of one of its members.

*Tennessee v. Davis*, 100 U.S. 257, 263 (1879). Thus, to qualify for removal, the defendant must be

a federal officer (or someone acting under a federal officer), *and* must establish that the suit is "for

an[] act [done] under color of such office." § 1442(a)(1). As it is undisputed that DeVecchio was

a federal officer during the relevant time period, only the second requirement is at issue here.

The "color of office" requirement has appeared in every federal-officer removal

statute since 1866. *See Mesa v. California*, 489 U.S. 121, 134 (1989) (citing Act of July 13, 1866,

ch. 184, § 67, 14 Stat. 171). The requirement serves an important jurisdictional purpose; as the

Supreme Court explained in *Mesa*, § 1442(a) is "a pure jurisdictional statute, seeking to do nothing

more than grant district court jurisdiction over cases in which a federal officer is a defendant." 489

U.S. at 136. As such, the statute "cannot independently support Article III 'arising under'

jurisdiction." *Id.* 'Rather, it is the raising of a federal question in the officer's removal petition that

constitutes the federal law under which the action against the federal officer arises for Article III

purposes." *Id.*

*Mesa* is the last time the Supreme Court spoke about the application of § 1442(a) in

the context of a state criminal prosecution; its analysis of the history of the statute, its prior

precedents, and its rationale for rejecting removal in that case shape the debate that governs the

resolution of the present case.

The precise issue in *Mesa* was "whether United States Postal Service employees may,

pursuant to 28 U.S.C. § 1442(a)(1), remove to Federal District Court state criminal prosecutions

brought against them for traffic violations committed while on duty." *Id.* at 123.[4] Drawing on past precedent, the Court held that removal was not warranted because it was not predicated upon an averment of a colorable federal defense. *See id.* at 133 ("In sum, an unbroken line of this Court's decisions extending back nearly a century and a quarter have understood all the various incantations of the federal officer removal statute to require the averment of a federal defense." ). The Court reasoned that the "color of office" requirement must be tethered to the existence of a defense based on federal law since the elimination of the federal defense requirement would "raise[] serious doubt whether in enacting § 1442(a), Congress would not have expanded the jurisdiction of the federal courts beyond the bounds established by the Constitution." *Id.* at 136 (internal citation omitted).

In reaching its conclusion, the Court took pains to address its prior decision in *Maryland v. Soper*, 270 U.S. 9 (1926) ("*Soper (No. 1)* "), the leading pre-*Mesa* case explaining what is required to link the "color of office" requirement to a colorable federal defense to a state criminal prosecution. There, two federal revenue agents were indicted for murder in state court; seeking to remove the prosecution to federal court, the defendants affirmed that, after destroying an illegal still and unsuccessfully pursuing its operators, they had come upon the murder victim while walking back to the farm on which the still was located. *See* 270 U.S. at 23-24. Removal was rejected because the averments were "not sufficiently informing and specific to make a case for removal," *id.* at 34, since they amounted "to hardly more than to say that the homicide on account of which they are

---

[4]At the time *Mesa* was decided, § 1442(a)(1) provided for removal only in cases against an "officer of the United States or any agency thereof, or person acting under him," 28 U.S.C. § 1442(a)(1) (1989); removal could not be sought in cases brought directly against federal agencies. *See International Primate Protection League v. Administrators of Tulane Educ. Fund*, 500 U.S. 72, 79 (1991) ("We have little trouble concluding that the statutory language excludes agencies from the removal power."). The statute now provides for removal in cases against "the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof." *Id.* (2006). This change in language is immaterial here.

charged with murder was at a time when they were engaged in performing their official duties." *Id.*

Specifically, the defendants

> [did] not negative the possibility that they were doing other acts than official acts at the time and on this occasion, or make it clear and specific that whatever was done by them leading to the prosecution was done under color of their federal official duty . . . . [T]he person seeking the benefit of [the removal statute] should be candid, specific and positive in explaining his relation to the transaction growing out of which he has been indicted, and in showing that his relation to it was confined to his acts as an officer.

*Id.* at 35; *see Symes*, 286 U.S. at 521 (applying this specificity test in rejecting removal because petition asserting immunity defense was "so vague, indefinite and uncertain as not to commit petitioner in respect to essential details of the defense").

Although the Court in *Soper (No. 1)* rejected the petition as "not sufficiently informing," it also rejected Maryland's contention that a federal officer can remove a criminal prosecution only "by admitting that he did the act for which he is prosecuted," 270 U.S. at 32, and formulated the following test for determining whether removal can nonetheless be warranted:

> There must be causal connection between what the officer has done under asserted official authority and the state prosecution. It must appear that the prosecution of him, for whatever offense, has arisen out of the acts done by him under color of federal authority and in enforcement of federal law, and he must by direct averment exclude the possibility that it was based on acts or conduct of his not justified by his federal duty. But the statute does not require that the prosecution must be for the very acts which the officer admits to have been done by him under federal authority. *It is enough that his acts or his presence at the place in performance of his official duty constitute the basis, though mistaken or false, of the state prosecution.*

*Id.* at 33 (emphasis added).

In *Mesa*, however, the Court "[did] not understand the causal connection test in *Soper (No. 1)* to have eliminated the general requirement that federal officer removal be predicated on the existence of a federal defense," 489 U.S. at 132; nonetheless, it recognized that "*Soper (No. 1)*

presented a *unique criminal prosecution,* markedly unlike those before us today, where a federal

officer pleaded by traverse and sought removal," *id.* (emphasis added), and that "the decision assumed

that a situation could arise in which *a petition that pleaded by traverse might warrant removal." Id.*

(emphasis added). It further commented: "Under such circumstances, we suggested [in *Soper (No.*

*1)*] that careful pleading, demonstrating the close connection between the state prosecution and the

federal officer's performance of his duty, might adequately replace the specific averment of a federal

defense." *Id.* It cautioned, however, that "[w]e are not today presented with such a pleading by

traverse and need not decide whether removal on the grounds suggested in *Soper (No. 1)* would be

permissible under either the statute or the Constitution." *Id.*

   In so holding, the Court in *Mesa* distinguished its prior decision in *Willingham v.*

*Morgan* in order to make clear that it "d[id] not understand *Willingham* [] to have been such a case."

*Id.* (citing *Willingham*, 395 U.S. at 406-07). *Willingham* was a state civil suit against federal prison

officials – the warden and chief medical officer – on state-law grounds for injuries that the plaintiff

allegedly received while imprisoned. *See* 395 U.S. at 403. The defendants denied having knowledge

of any possible wrongdoing, relying simply on the undisputed fact that their only contacts with the

plaintiff occurred inside the penitentiary while they were performing their duties. *See id.* at 407-08.

Recognizing a tension between that part of *Soper (No. 1)* requiring the person seeking removal to be

"'candid, specific and positive in explaining his relation to the transaction' which gave rise to the

suit," *id.* at 408 (quoting *Soper (No. 1)*, 270 U.S. at 35), and *Soper (No. 1)*'s qualification that "the

federal officer, in order to secure removal, need not admit that he actually committed the charged

offenses," *id.* (citing *Soper (No. 1)*, 270 U.S. at 32-33), the Court in *Willingham* viewed the federal

officials as "confronted with something of a dilemma" because

    Respondent had filed a 'scattergun' complaint, charging numerous
    wrongs on numerous different (and unspecified) dates. If petitioners

were to be 'candid, specific and positive' in regard to all these allegations, they would have to describe every contact they ever had with petitioner, as well as all contacts by persons under their supervision. This would hardly have been practical, or even possible for senior officials like petitioners.

*Id.* at 408-09.

The Court reasoned, therefore, that "[i]n a civil suit of this nature . . . it was sufficient for petitioners to have shown that their relationship to respondent derived solely from their official duties." *Id.* at 409. Recalling its language in *Soper (No. 1)* interpreting the "color of office" test to require a showing of a "causal connection," it viewed the showing in *Willingham* as sufficient to "put in issue the questions of official justification and immunity" warranting removal. *Id.* The Court noted, however, that "[w]ere this a criminal case, a more detailed showing might be necessary because of the more compelling state interest in conducting criminal trials in the state courts." *Id.* at 408 n.4.

In *Mesa*, the Court explained that "[i]n *Willingham* we adverted to the causal connection test of *Soper (No. 1),* not as a substitute for the averment of an official immunity defense, but as a means of delimiting the pleading requirements for establishing a colorable defense of that nature." *Mesa*, 489 U.S. at 133 (citing *Willingham*, 395 U.S. at 409). *Mesa* declined, therefore, "to divorce the federal official immunity defense from the pleadings required to allege it and transform those pleading requirements into an independent basis for jurisdiction," *id.*; it concluded that "the liberal pleadings sufficient to allege an official immunity defense which we permitted i*Willingham"* were "inapplicable" to removal in *Mesa* because the petitioners "have not and could not present an official immunity defense to the state *criminal* prosecutions brought against them." *Id.* at 133 (emphasis added). In so holding, the Court quoted its language in *Imbler v. Pachtman* that it "has never suggested that the policy considerations which compel civil immunity for certain governmental

officials also place them beyond the reach of the criminal law." *Mesa*, 489 U.S. at 133 (quoting *Imbler*, 424 U.S. 409, 429 (1976)).

One other aspect of *Mesa* warrants mention: Quoting *Willingham*, the Court noted that Congress' enactments of the federal removal statutes were designed not only "to provide a federal forum for cases where federal officials must raise defenses arising from their official duties," but also "to protect officers from interference by hostile state courts." *Id.* at 137 (quoting *Willingham*, 395 U.S. at 405). Because of this, the Government, in support of its removal application, asked the Court in *Mesa* to apply the theory of "protective jurisdiction," arguing that "the full protection of federal officers from interference by hostile state courts cannot be achieved if the averment of a federal defense must be a predicate to removal." *Id.* In rejecting this argument, the Court wrote:

> We have, in the past, not found the need to adopt a theory of 'protective jurisdiction' to support Art. III 'arising under' jurisdiction . . . , and we do not see any need for doing so here because we do not recognize any federal interests that are not protected by limiting removal to situations in which a federal defense is alleged. In these prosecutions, no state court hostility or interference has even been alleged by petitioners and we can discern no federal interest in potentially forcing local district attorneys to choose between prosecuting traffic violations hundreds of miles from the municipality in which the violations occurred or abandoning those prosecutions.

*Id.* (citation omitted).

In a concurring opinion joined by Justice Marshall, Justice Brennan agreed that there was no significant federal interest that would be served by removal of routine traffic cases, like that case, but cautioned "that Congress' concern about local hostility to federal authority could come into play in some circumstances where the federal officer is unable to present 'any federal defense.'" *Id.* at 140. He gave the following examples of such circumstances:

> The days of widespread resistance by state and local governmental authorities to Acts of Congress and to decisions of this Court in the areas of school desegregation and voting rights are not so distant that

we should be oblivious to the possibility of harassment of federal agents by local law enforcement authorities. Such harassment could well take the form of unjustified prosecution for traffic or other offenses, to which the federal officer would have no immunity or other federal defense. The removal statute, it would seem to me, might well have been intended to apply to such unfortunate and exceptional circumstances.

*Id.*

Justice Brennan viewed the majority opinion, therefore, as "leav[ing] open the possibility that where a federal officer is prosecuted because of local hostility to his function, 'careful pleading, demonstrating the close connection between the state prosecution and the federal officer's performance of his duty, might adequately replace the specific averment of a federal defense.'" *Id.* (citing majority opinion).

Nonetheless, the circumstances, if any, when "a petition that pleaded by traverse might warrant removal . . . on the grounds suggested in *Soper (No. 1),*" *Mesa*, 489 U.S. at 132, remain, to this date, unresolved.

### III.

### A.

Notably, *Mesa* employed the nomenclature of a "colorable federal defense", rather than a "colorable immunity defense." It presumably did so in recognition that acts done in self-defense by a federal officer in the performance of his duties may not implicate the Supremacy Clause, which is the basis for federal immunity, *see In re Neagle*, 135 U.S. 1, 75-76 (1890), but may nonetheless qualify as a federal defense since it may depend on the federal law regulating that officer's conduct. This is borne out by the pains *Mesa* took to distinguish and explain its holding in *Tennessee v. Davis*, in which Davis, a federal revenue officer charged with murder, sought removal on the ground the he had fired on the victim (the owner of an illegal distillery that Davis was charged

with destroying) in self-defense. *See* 100 U.S. at 261. In response to the argument that Davis'

proffered defense presented no federal question, the Court in *Mesa* explained that

> the successful legal defense of "self-defense" depends on the truth of two distinct elements: [1] that the act committed was, in a legal sense, an act of self-defense, and [2] that the act was justified, that is, warranted under the circumstances. In Davis' case, the truth of the first element depended on a question of federal law: was it Davis' duty under federal law to seize the distillery? If Davis had merely been a thief attempting to steal his assailants' property, returning their fire would simply not have been an act of self-defense, pretermitting any question of justification. Proof that Davis was not a thief depended on the federal revenue laws and provided the necessary predicate for removal.

489 U.S. at 127-28; *see also New York v. Tanella*, 239 F. Supp. 2d 291, 296-298 (E.D.N.Y. 2003)

(recognizing distinction between, and applying, self-defense and Supremacy Clause immunity).

Nonetheless, *Mesa* focused on the immunity defense. *See North Carolina v. Ivory*,

906 F.2d 999, 1002 (4th Cir. 1990) ("[U]nder *Mesa* [the federal officer] must allege facts that would

support a colorable *immunity* defense[.]" (emphasis added)). As the Second Circuit has explained,

in the context of a criminal prosecution, the immunity defense bars a state from prosecuting a federal

agent for alleged violations of a state criminal law if "(1) the federal agent was performing an act

which he was authorized to do by the law of the United States and (2) in performing that authorized

act, the federal agent did no more than what was necessary and proper for him to do." *Whitehead v.

Senkowski*, 943 F.2d 230, 234 (2d Cir. 1991) (citing *In re Neagle*, 135 U.S. at 75); *see also Soper (No.

1)*, 270 U.S. at 34 ("The defense [the officer] is to make is that of his immunity from punishment by

the state, because what he did was justified by his duty under the federal law, and because he did

nothing else on which the prosecution could be based.").

There have only been three cases subsequent to *Mesa* that have addressed the

availability of an immunity defense as a basis for removal of a state criminal prosecution to federal

court; they provide content for its application.

In *Ivory*, decided just months after *Mesa*, a marine was charged in state court with vehicular homicide for failing to yield the right of way in violation of state law. *See* 906 F.2d at 1000. He sought removal on the grounds that "he was driving in a military convoy and believed that it was safe to enter the intersection [where the accident occurred] with his convoy truck." *Id.* at 1000. In rejecting removal, the Fourth Circuit explained:

> Like the Postal Service workers in *Mesa*, Ivory has not alleged a defense of federal immunity. Ivory was subject to local traffic laws concerning rights of way, speed limits and the like, . . . and he has not alleged anything in the conduct of his federal responsibilities which justified his violation of these laws.

*Id.* at 1001-02 (citations and footnote omitted). The court then described a situation where there would be federal immunity for a violation of state traffic laws: "[S]tate law will not apply to federal officials 'engaged in the performance of a public duty where speed and the right of way are a necessity.'" *Id.* at 1002-03 (quoting *Lilly v. West Virginia*, 29 F.2d 61, 64 (4th Cir. 1928) (federal officer immune from prosecution for speeding while pursuing a fleeing felon)).

In *North Carolina v. Cisneros*, 947 F.2d 1135 (4th Cir. 1991), the Fourth Circuit again rejected removal of a state prosecution for vehicular homicide against a marine based on the violation of state traffic law; as in *Ivory*, the federal officer was also driving his vehicle while on active duty. *See id.* at 1137. Relying on *Ivory*, the court explained that "to establish . . . a federal immunity defense – hence federal removal jurisdiction – growing out of an on-duty vehicular traffic accident, a federal officer must show that the accident resulted from an exigency or emergency related to his federal duties which dictated or constrained the way in which he was required to, or could, carry out those duties." *Id.* at 1139.

Each of these cases, therefore, makes clear that immunity does not attach merely

17

because state criminal prosecutions are based upon acts that happen during the scope of a federal officer's employment. *See Ivory*, 906 F.2d at 1003 (criticizing dissent for "relapsing into the same 'scope of employment' test for removal of state prosecutions which was explicitly rejected by the Supreme Court in *Mesa")*; rather, the acts themselves must of necessity be required in the discharge of the officer's duties. *See id.* ("Had there been any exigency stemming from the duties of military service or federal employment this would . . . have been a different case.").

Finally, in *Tanella*, the district court, in addition to viewing self-defense as constituting a federal defense, also embraced the applicability of Supremacy Clause immunity because, "were defendant to prove that he reasonably believed that his actions were necessary and proper in the performance of his duties, he would be completely immune from all criminal liability." 239 F. Supp. 2d at 298 (citing *In re Neagle* and *Whitehead*).[5]

## B.

Only one case subsequent to *Mesa* has confronted a pleading by traverse. In *Kolibash v. Committee on Legal Ethics of West Virginia Bar*, 872 F.2d 571 (4th Cir. 1989), Judge Wilkinson, writing for a unanimous court, noting that *Mesa* indeed "explicitly left unresolved the question of whether 'careful pleading demonstrating the close connection between the state prosecution and the federal officer's performance of his duty, might adequately replace the specific averment of a federal

---

[5]In distinguishing between the two defenses, *Tanella* relied on *Mesa*, which, as noted, described self-defense as something different from the immunity conferred by federal authority under the conditions set forth in *In re Neagle*. *See Tanella*, 239 F. Supp. 2d at 297 (citing *Mesa*, 489 U.S. at 127). In the Court's view, self-defense is, when alleged by a federal official, merely a subspecies of the broader immunity defense. As the Supreme Court recognized in *Maryland v. Soper (No. 2)*, 270 U.S. 36 (1926), "removals of prosecution on account of acts done in enforcement of [federal] laws or under color of them properly include those for acts committed by a federal officer in defense of his life, threatened while enforcing or attempting to enforce the law. *Such acts of defense are really part of the exercise of his official authority. They are necessary to make the enforcement effective." Id.* at 42 (emphasis added).

defense,'" *id.* at 574 (quoting *Mesa*, 489 U.S. at 132*),* held that *Kolibash* was "such a case." *Id.*

There, disciplinary proceedings were brought against Kolibash by the West Virginia State Bar charging that while he was acting in his capacity as the United States Attorney for the Northern District of West Virginia, he failed to adequately supervise one of his Assistant United States Attorneys who had allegedly engaged in professional misconduct in the course of a grand-jury investigation of a former client and, furthermore, that Kolibash failed to disclose pertinent information during a state-court investigation of the conflict of interest charges underlying that misconduct. In his removal petition, Kolibash simply denied that he had engaged in any misconduct. The court "believe[d] that such pleading [was] *akin* to pleading a defense of immunity and that, in any event, the more liberal pleading requirements noted in *Mesa* [were] particularly well suited to the circumstances of the case." *Id.* (emphasis added).

In supporting its holding that removal was warranted since the pleading was "akin" to pleading an immunity defense, the court believed that the "[p]olicies supporting the doctrine of official immunity [were] plainly implicated[ ], *id.* at 574, citing cases "illustrat[ing] the importance of the unstinting performance of public duties by public officials - much the same interests implicated in the federal officer removal statute." *Id.* at 574-75 (citing, *inter alia*, *Imbler*, 424 U.S. at 423).

Recognizing that the state disciplinary proceeding was a "hybrid quasi-civil proceeding," in contrast to the criminal proceeding involved in *Mesa,* the court declined to arrogate form over substance since the disciplinary proceeding could result in "public reprimands, suspensions, or disbarment of lawyers." *Id.* at 576. Given the potentially punitive nature of such proceedings, and that "state professional disciplinary proceedings could be used to interfere with the duties of federal officials," the court concluded that "a colorable claim of immunity exists, the validity of which should be judged by federal standards in a federal district court." *Id.* at 575. In support of its conclusion, it

viewed the right of removal "to be broadly construed," *id.* at 576; *see Symes*, 286 U.S. at 517 ("It scarcely need be said that measures [afforded by the removal statute] are to be liberally construed to give full effect to the purposes for which they were enacted."). In so holding, the court noted that "[t]here is a world of difference between the duties of prosecutorial supervision involved here and the circumstances of *Mesa* where the federal postal employees seeking removal clearly could not present an official immunity defense to the state criminal prosecutions brought against them." *Id.* In contrast to *Mesa,* the court explained that "this case not only involves the extent of a United States Attorney's responsibility for the acts of his subordinates, but the scope of a federal prosecutor's duty to disclose the details of a federal grand jury investigation in a subsequent hearing on a charge of prosecutorial misconduct." *Id.*

Finally, although not relying on the notion of "protective jurisdiction" to sustain removal, the court noted that "many of the federal interests underlying that theory [were] particularly relevant," referencing, for example, that Kolibash's alleged misconduct "arose out of a federal grand jury drug investigation and a subsequent criminal trial in federal district court"; therefore, "[s]ignificant federal interests" were involved "regardless of whether Kolibash [had] a federal defense to the state professional disciplinary proceeding." *Id.* The court once again contrasted *Mesa* as a case in which there was "no federal interest" to support removal by the postal workers. *Id.*

## IV.

How then should the present case be resolved? It requires the Court to discern whether a colorable federal defense has been asserted, and, if not, whether, because of the case's unique characteristics, it comes under the embrace of the unresolved statutory and constitutional questions left open in *Mesa* as to when, if at all, a petition pleading by traverse warrants removal.

## A.

Neither of DeVecchio's two proffered defenses rises to the level of a federal defense. As for his immunity defense, although DeVecchio's general claim that everything he did was in the context of the discharge of his federal duties might well satisfy the broad pleading requirements under *Willingham*'s liberal immunity standard for removal in civil cases,[6] he simply cannot satisfy the more stringent requirements for criminal cases by denying that he ever said anything to Scarpa about the victims Scarpa allegedly arranged to murder, and hence could not have been an aider and abettor to their murders.

Put simply, DeVecchio does not, of course, claim that he was authorized to disclose information to Scarpa about the four victims that could have lead to their murders; nor does he detail whatever conversations he did have with Scarpa that could arguably have been misconstrued as aiding and abetting those murders.[7] He is simply being charged with outright murders having nothing to do with his federal duties. As the Supreme Court aptly noted in *Symes*, "while homicide that is excusable or justifiable may be committed by an officer in the proper discharge of his duty, murder

---

[6] At oral argument, the State acknowledged that if this were a civil case, *Willingham* would control. *See* Tr. of Aug. 9, 2006 ("Tr."), at 15.

[7] In fact, the Attorney General has promulgated guidelines specifically circumscribing authorization for confidential informants to commit crimes. Under the guidelines in effect during the period covered by the present indictment, a CI could not be authorized to commit a crime of violence unless a special-agent-in-charge, after consulting with the appropriate United States Attorney, determined in writing that (1) "the conduct is necessary to obtain information or evidence for paramount prosecutive purposes, to establish or maintain credibility or cover with persons associated with criminal activity under investigation, or to prevent or avoid the danger of death or serious bodily injury, and (2) such necessity "outweighs the seriousness of the conduct involved." Attorney General's Guidelines on FBI Use of Informants and Confidential Sources, Part F (promulgated 1980; superseded 1996). The current guidelines are even more restrictive: "A [Department of Justice Law Enforcement Agency] is never permitted to authorize a CI to . . . participate in an act of violence." Attorney General's Guidelines Regarding the Use of Confidential Informants, Part C(1)(b)(i) (promulgated 2002).

or other criminal killings may not." 286 U.S. at 518.

In short, this is not a case where the federal officer claims that "I did it, but was authorized or justified" – or even "What the State contends I did, though mistaken or false, I was authorized to do." Although it may well be that DeVecchio's denial of the charges may justifiably be based on the fact that he never spoke to Scarpa about the victims, this is simply not a defense based on federal immunity giving rise to Article III "arising under" jurisdiction. And DeVecchio's claim that his only contact with Scarpa was as his FBI handler amounts to nothing more than a "scope of employment" claim, which, as *Ivory* and *Cisneros* reinforce, is insufficient to satisfy the pleading requirements for an immunity defense in a criminal case.

DeVecchio argues that, in any event, he has a federal defense based on 18 U.S.C. § 6002, which provides that "no testimony or other information compelled under [a grant of federal immunity] or any information directly or indirectly derived from such testimony or other information may be used against the witness in any [state or federal] criminal case." It is well-established that a defendant claiming a violation of § 6002 may demand a "*Kastigar* hearing," at which the government is required "to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Kastigar v. United States*, 406 U.S. 441, 460 (1972).

DeVecchio's claim is based on the fact that, in exchange for immunity, he was compelled to give testimony in the course of an FBI internal investigation, and again during the trials of Orena and Scarpa, Jr., centering on his knowledge, or lack thereof, of Scarpa's involvement in various crimes of violence. Be that as it may, this would not equate to a federal defense against the murder charges. In the first place, neither DeVecchio's immunized statement nor his trial testimony addresses, or even mentions, any of the four murders. In any event, even if this were not the case, or if the State were to seek to present immunized evidence during the trial, the state-court judge is

perfectly capable of suppressing such evidence or even dismissing the indictment. *See United States v. Rivieccio*, 919 F.2d 812, 816 & n.4 (2d Cir. 1990) (remedy for violation of § 6002 is suppression of tainted evidence at trial; dismissal of indictment proper only when immunized testimony was presented directly to grand jury or indictment rests "almost exclusively on tainted evidence").[8]

In sum, the so-called *Kastigar* defense is not a federal defense supporting Article III removal jurisdiction; rather, it is simply a vehicle for the suppression of immunized evidence or the dismissal of an indictment based on such evidence, be it in a federal or state criminal proceeding.

**B.**

If not for the unique nature of this case growing out of the establishment of a special relationship between a federal agent, whose duties required embroiling himself in the underbelly of the criminal world, and a notorious and dangerous mafioso turncoat, there would be no question, barring an exception to the requirement of a colorable federal defense, that a federal officer who, by traverse, disassociated himself from any involvement with, or knowledge of any facts, underlying state-law murder charges would have to be tried in state court. The ultimate question is whether there are circumstances, as *Mesa* conjures, that could substitute for the assertion of a federal defense, thereby permitting removal where petitioner pleads by traverse, and, if so, whether such circumstances are extant in the present case.

In exploring the full reach of its subject-matter jurisdiction, the Court at oral argument invited the parties to address the issue of the nature of the special relationship between a federal agent and his confidential informant. *See* Tr. at 15-18. At the Court's prodding, DeVecchio's thereafter

---

[8]To dispel the notion that it may have used any of DeVecchio's immunized statements or testimony to obtain the indictment in the present case, the State has submitted the transcript of the grand jury proceedings; since the Court concludes that a "*Kastigar* defense" does not support removal, there is no warrant to review that transcript.

responded by submitting his affidavit explaining that the agent "is always concerned about maintaining the trust of his source," that "[a]ny special agent who handles a confidential source did so (and still does so) in a highly sensitive and clandestine way," and that "[t]he FBI encourages these clandestine relationships because the information derived from these sources is the lifeblood of its investigatory activity." DeVecchio Aff. ¶ 3. He also reinforced his contention that every conversation he had with Scarpa "was in furtherance of my duties and responsibilities as a special agent of the FBI," and that he "never knowingly provided Scarpa with information which could have led to, or assisted him, in the murder of any individual." *Id.* at ¶ 9. The affidavit does not, however, state whether DeVecchio had any conversations about any of the victims and, if so, the nature of those conversations.

For its part, the State pointed out at oral argument, *see* Tr. at 18, that the Court in *Mesa* never answered the questions which it posed, namely under what circumstances, if any, would pleading by traverse, in the absence of a federal defense, be permissible "under either the statute or the Constitution." *Mesa,* 489 U.S. at 132. Referencing Justice Brennan's concurrence, the State argued that if an exception to a federal defense were to exist, "it would only exist where [petitioner] could demonstrate a pattern or strong evidence of hostility of state courts against federal officers." Tr. at 19.

The State is quite right in concluding that *Mesa* never answered the discrete questions of whether Congress ever intended the removal statute to apply in the absence of the assertion of a colorable federal defense, and, if so, whether the removal statute would be a violation of Article III "arising under" jurisdiction. *Mesa* did, however, touch upon the constitutional issue in rejecting the theory of "protective jurisdiction" because the Court "[d]id not recognize any federal interests that are not protected by limiting removal to situations in which a federal defense is alleged." *Mesa*, 489

24

U.S. at 137. Subsequent circuit court decisions have interpreted this language in *Mesa* as "reject[ing]" the notion of a 'protective jurisdiction' that goes beyond the reach of any substantive federal law." *A.I. Trade Finance, Inc. v. Petra Int'l Banking Corp.,* 62 F.3d 1454, 1461 (D.C. Cir. 1995); *Cisneros,* 947 F.2d at 1140 (reaching same conclusion). Nonetheless, *Mesa* did not slam the door shut on protective jurisdiction since the Court went on to say that "no state court hostility or interference has even been alleged by petitioners," and it could not "discern [any] federal interest" to bar the state-court prosecutions. *Id.* at 137-38.

DeVecchio does not contend that there was any state-court hostility to, or interference with, the performance of his duties as a federal officer, and surely this is not the type of case envisioned by Justice Brennan in which local authorities vent their hostility towards federal officers engaged in safeguarding basic civil rights by bringing unjustified prosecutions "to which the federal officer would have no immunity or other federal defense." *Mesa*, 489 U.S. at 140 (concurring opinion).

There is, therefore, no jurisdictional reach in the present case to support Article III "arising under" jurisdiction even under Justice Brennan's understanding of the Court's majority opinion in *Mesa*; the Court cannot discern any federal interest in this case that could possibly satisfy constitutional jurisdiction regardless of the nature of the special relationship that DeVecchio was required to establish with Scarpa in the performance of his duties as a federal agent.

Moreover, from a statutory perspective, the Court cannot conclude that Congress, in enacting the removal statute, ever intended that a state could not prosecute a federal agent for committing state crimes where there was no federal defense to the crime or any federal interest that would also satisfy Article III "arising under" jurisdiction. Indeed, "it is axiomatic that the right of the states, consistently with the Constitution and laws of the United States, to make and enforce their own

laws is equal to the right of the federal government to exert exclusive and supreme power in the field that by virtue of the Constitution belongs to it. " *Symes*, 286 U.S. at 518. Significantly, in *Mesa* the Court noted that it has "identified a strong judicial policy against federal interference with state criminal proceedings" since "it goes without saying that preventing and dealing with crime is much more the business of the State than it is of the Federal Government"; therefore, "the regulation of crime is pre-eminently a matter for the States." 489 U.S. at 139 (citation omitted).

Nor does the Fourth Circuit's decision in *Kolibash* call for a different conclusion. First, without discussion, the court incorrectly interpreted *Mesa* as answering the questions which *Mesa* specifically left open – whether there can ever be a statutory and constitutional exception to a federal defense. In any event, although the Fourth Circuit viewed the circumstances before it as representing such an exception, it nonetheless considered the role of the United States Attorney in those circumstances as being "akin" to an immunity defense, 872 F.2d at 574, since the "[p]olicies supporting the doctrine of official immunity [were] plainly implicated[,]" *id.*; therefore, it concluded that "a colorable claim of immunity exist[ed.]" *Id.* at 575. There is no parallel to the present prosecution which, notwithstanding the sensational nature of the charges, is a prototypical state-law murder case.

In sum, removal is not warranted because DeVecchio has not asserted a federal defense to the murder charges; nor does he come within the exception contemplated by *Mesa* where pleading by traverse might substitute for the absence of a federal defense because the federal interests he asserts do not come within the embrace of the removal statute and, of overriding concern, do not satisfy Article III "arising under" jurisdiction. In this latter regard, there is simply no escape from the constitutional prerequisite for removal; it is satisfied under the Supremacy Clause when there is, unlike this case, an immunity defense or an assertion of self-defense in the performance of a federal

26

officer's duties - a subspecies of the immunity defense. It would also be warranted when there is state hostility to the enforcement of federal laws by federal agents, also unlike this case, since this too would implicate the Supremacy Clause. *See M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819) (Marshall, C.J.) ("The states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government. This is . . . the unavoidable consequence of that supremacy which the constitution has declared.").

## CONCLUSION

The case is remanded.

**SO ORDERED.**

/s/

_____

FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
January 9, 2007